IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| ROBERT N. MELTZER d/b/a THE | ) |
| MOUNTAIN STATES LAW GROUP | ) |
| | ) |
|      Plaintiff | ) |
| | ) |
| v. | )      CIVIL ACTION NO:_____ |
| | ) |
| THE TRIAL COURT OF THE | ) |
| COMMONWEALTH BY JOHN BELLO, | ) |
| ITS ADMINISTRATOR | ) |
| | ) |
|      Defendant | ) |

_____

COMPLAINT
(For Declaratory and Injunctive Relief and Damages)

<u>INTRODUCTION</u>

This action challenges the legality and constitutionality of the Massachusetts Trial Court's "Supreme Judicial Court's Fourth Order Regarding Public Access to State Courthouses & Court Facilities" dated July 1, 2021, particularly Section 7, "Masks" which states in its entirety "until further notice, except as provided below, all persons, even if fully vaccinated, must wear a mask covering their nose and mouth while inside a courthouse."  ("The Standing Order") See, Exhibit A. The Trial Court of the Commonwealth has violated the Americans With Disabilities Act by refusing to provide a reasonable accommodation. Equally the Plaintiff requests that the Order should be vacated as being outside the Trial Court's superintendency powers, and that the Standing Order is impermissibly broad and under inclusive.

This mask policy provides no medical exemption, notwithstanding that even CDC guidance exempts those with difficulties with breathing from mask use. Mask use is not only an

ineffective epidemiological deterrent to aerial viral spread, as generally admitted and conceded, but it is also dangerous to a broad swath of the population susceptible to conditions known as hypoxia and other forms of oxygen deprivation, with attendant causal links to the onset of Alzheimer's  Disease and other medical conditions; for people with disposition toward hypoxia, excessive and unnecessary mask use is also likely the cause of the upsurge of air rage" which has been seen since the inception of federal mask mandates on aircraft. Masks are not simply an "inconvenience" or "political" issue; forcing masks on those with breathing difficulties is akin to torture, banned by the United Nations Convention Against Torture, of which the United States and its political subagents, must respect. Governmental force in masking invokes the same physical reaction as waterboarding.

Plaintiff in this case has been barred from access to court buildings in the Land Court, the Middlesex Probate and Family Court, the Worcester Superior Court, the Uxbridge District Court and elsewhere and will continue to be barred, in violation of his rights under the Americans with Disabilities Act. The Trial Court has failed to engage in a good faith interactive process, and has failed to offer any form of reasonable accommodation, to the detriment and harm to the Plaintiff, who is a trial lawyer. Specifically, the Trial Court has denied the Plaintiff the ability to engage in one or more of his major life activities under the Americans with Disabilities Act 42 U.S,C. § 12101 et seq.,

Indeed, as noted below, the ADA exemption process in this case raises the curious and ironic situation in which the Trial Court does not seem to know how a court system works or why, or what lawyers actually do in a courthouse and the Court has expressed disinterest and lack of curiosity in even trying to correct its deficient knowledge during a process which is supposed to be a good faith interactive process to determine mandatory exemptions.

The Trial Court has also exceeded its superintendency power by crossing the impermissible line from "regulation" to "legislation" as defined by the United States Supreme Court in <u>National Federation of Independent Businesses v. Department of Labor</u>, 595 US____ (2022) ("the OSHA case") and its own jurisprudence in <u>Desrosiers v. Baker</u> ("The Civil Defense Act Case.")  The Standing Order is outside the power of the Trial Court, and is otherwise both overly broad and under inclusive, and has no correlation to any compelling interest that warrants a mask policy for courts from Provincetown to Pittsfield and Methuen to Medway and everywhere in between, and which creates an odd archipelago of restriction where utterly unnecessary. More broadly, the mask mandate without exception also bars judges, court clerks, court officers, court reporters, witnesses, litigants and potential jurors from participation in the legal process, thereby utterly corrupting the function of the entire judicial branch of government, denying equal access to justice in the Massachusetts courts and denying due process of law generally within the Commonwealth.

This case also presents the latent issue of "defacto liability" under the ADA, which has been mostly hypothetical for 30 years but which has now been tacitly recognized by the Supreme Court in the OSHA case, and in which the remedy is the voiding of the rule or government act which causes it. Since its inception in 1991, the Americans with Disabilities Act, through its statement of purpose and definitions, broadly construed, has impliedly anticipated two distinct and separate forms of disability—those that are dejure, meaning permanent conditions, and those that are de facto, meaning those that are temporary, but not transient, as defined as being of less than 6 months in duration under Section 12102 and the Act's "purposes; under Section 12101(b), which includes under (b)(1) the notion that the Act is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Left

unsaid, or at least undefined, is that no one may create disability, and then discriminate based upon that disability, much as one may not set booby traps to harm trespassers. As the academic hypothetical renders the distinction, de jure discrimination occurs when there is a stumbling block before the blind, thereby requiring a land proprietor to remove the block as a matter of law and to make the process of removal seamless and with respect to the dignity of the disabed. De facto discrimination occurs when the actor intentionally places a stumbling block before the sighted and then turns off the lights. Under both scenarios, the actor is mandated by the Americans with Disabilities Act to prevent discrimination on the basis of the block (which creates the instrumentality of harm), whether or not the party impacted is disabled by law or disabled by the actions of the actor in interjecting an instrumentality that renders a person unable to engage in a major life activity. The cases which have been filed arising from mandates in response to SARS-CoV-2/COVID-19 involve broadly cases in which the creation of mandates present disability in people who are otherwise disabled and it has been done with stated intentions of humiliating the non-conforming, and those mandates are increasingly deemed to be unenforceable under superintendency grounds.

The Plaintiff in this case asks this Court to rule that the Standing Order on masks is illegal and unconstitutional and null and void and without effect.

The Plaintiff in this case asks this Court to rule that the Standing Order has caused harm to the Plaintiff for which damages are owed. Because the Plaintiff contends that proposed "accommodation" offered by the Trial Court is not only unreasonable, but also reflects a lack of understanding what the Trial Court is and how it is constitutionally configured, the Plaintiff feels compelled to provide substantial factual background to demonstrate state of mind of unreasonableness of the Trial Court.

<u>JURISDICTIONAL AUTHORITY OF THE COURT</u>

1) This action is brought pursuant to 28 U.S.C. §§ 1331 and 1343, and 28 U.S.C. §§ 2201,2202, 42 U.S.C. §§ 1971-73, 42 U.S.C. §§ 1983, 1985. This Court has jurisdiction specifically delegated to it by act of the United States Congress in the Americans with Disabilities Act. This action seeks to redress the deprivation under State and federal law of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States.

2) Plaintiff has standing in this case as a trial lawyer who has been denied access to court buildings throughout the Commonwealth under the Standing Order's mask requirement and the Defendant's refusal to grant exemption, thereby causing the Plaintiff to lose the ability to engage in the practice of law as a trial lawyer, pursuant to a Standing Order which has no sunset date, and which has already barred access for nearly two years.

<u>PARTIES TO THIS ACTION</u>

3) The Plaintiff, Robert N. Meltzer, d/b/a the Mountain States Law Group, is a member in good standing of the Massachusetts bar, as well as the bars of Wyoming, Utah, Idaho, Colorado and Wisconsin, with a principal place of business at 33 Bradford Street in Concord, Middlesex County, in the Commonwealth of Massachusetts.  ("The Plaintiff"). The Plaintiff is a trial lawyer who practices in the Courts of the Commonwealth, statewide.

4)  The Defendant, the Trial Court of the Commonwealth, by its Administrator, is one of three co-equal branches of government, with a principal office at One Pemberton Square in Boston in the Commonwealth of Massachusetts.

## FACTUAL BACKGROUND TO THIS CLAIM

## WHAT IS A COURT?

5)  The Massachusetts Trial Court was established by the Massachusetts Declaration of Rights, a constitution drafted by John Adams, and which was designed to create a Republican form of government, meaning a tri-partite balanced government consisting of an Executive, Legislative and Judicial branch.

6)  Within the Preamble, it is stated that "the body politic is formed by a voluntary association of individuals: it is a social compact, by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good. It is the duty of the people, therefore, in framing a constitution of government, to provide for an equitable mode of making laws, as well as for an impartial interpretation, and a faithful execution of them; that every man may, at all times, find his security in them.

7)  Article 1 of the Declaration of Rights commences by stated that "all people are born free and equal and have certain natural, essential and unalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties, and of acquiring, possessing and protecting property…"

8)  Article XI states that "every subject of the commonwealth ought to find a certain remedy,

by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property or character. He ought to obtain right and justice freely…and without any denial; promptly, and without delay…"

9) Article XV states that "[a] frequent recurrence to the fundamental principles of the constitution, and a constant adherence to those of piety, justice, moderation, temperance, industry, and frugality, are absolutely necessary to preserve the advantages of liberty, and to maintain a free government. The people ought, consequently, to have a particular attention to all those principles, in the choice of their officers and representatives: and they have a right to require of their lawgivers and magistrates, an exact and constant observance of them, in the formation and execution of the laws necessary for the good administration of the commonwealth."

10) Article XXIX states "It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit…"

11) Article XXX states "In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

12) It has long been the history of this Commonwealth to recognize that a "court" is not a building, but rather an institution of governance, a specific constitutional entity that forms a liminal interface between those wielding government power and the citizen.

13) Courts do not provide a "service" to subjects, but rather facilitate the constitutional obligation to engage in public adjudication of rights and responsibilities.

14) As Professor Ted V. McAllister has noted "Civic engagement does not mean organized appeals to a distant government, nor does it include any conception in which the citizens construe their relationship to the government, local or distant, in a manner similar to a client or a customer. Civic engagement rightly understood, in whatever particular form it takes, requires that citizens engage as citizens in a deliberative process in which they understand themselves to be partners in governance. Government, in this use of the word, is not limited to, nor must it be primarily, an expression of an organized government that supplies services…" McAllister, *Making American Places; Civic Engagement Rightly Understood*, in Why Place Matters 198  (New York, 2014)

15) It is not coincidental that American courts have traditionally been located in the public square, that court buildings have served as the central meeting place of a community, and that a court house is built to reflect the virtues and powers of democratic government.

16) In the language of what is sometimes referred to in the language of the Front Porch Republic movement, a "court" is a liminal civil space in which the citizenry, whether appearing as litigants, judges, jurors, witnesses, court officers, lawyers and the general public, gather together for the public and publicly visible and transparent act of the carrying out of law as created by the General Court.

17) A "court" is, by constitutional designation, the most direct point of contact within the Commonwealth of Massachusetts between the citizen and the state power for the purpose of redress of grievance, and, while the citizen may retain a lawyer as an intermediary, a citizen has the constitutional right to walk in to a courthouse and demand the right to see

a judge consistent with legal process; under almost any interpretation of the Massachusetts constitution, the doors to any courthouse should have no locks.

18) Courts do not "serve" the community; courts are the community. The community is the "demos" in "democracy."  A court operates in democracy by the open mingling of court officials, litigants, court employees, trial participants and the general public, all of whom have full and free and fair access. Democracy as constituted in the Declaration of Rights is based upon the full and complete involvement of all of the citizenry in the public discourse of justice as a matter of constitutional protection. The Courts of the early Republic were the Super Bowl of their day.

19) Courts have an implied superintendency power to effectuate an orderly process through its lawful powers to regulate passage and to maintain the public sphere of justice. As a matter of constitutional primacy, a Court must be inclusive, and not exclusive, and must operate within the legal process, including the Americans with Disabilities Act. When a person is excluded from the courthouse, the harm is not only sustained by the individual excluded, but by the community as a whole. An underlying principal of all anti-discriminatory laws is that no man is an island, and the exclusion of one takes away from the function of the whole.

20) While the distinction is often lost, a "regulation" is an act of a superintending agency to carry out the intent of the legislative authority.  "Legislation," on the contrary, is law which binds the citizen through the formulation of deliberative public will passed by the representatives of the people.

21) As noted in the Massachusetts Constitution, the judicial branch if barred from usurping the power of the General Court.

22) It is known for a certainty that the Defendant understands its own limits as to superintendency. In the Civil Defense Act Case handed down by the Massachusetts Supreme Judicial Court on December 10, 2020, the Massachusetts Supreme Court determined that the Commonwealth's Governor, acting through the Civil Defense Act passed by the General Court, had the power to issue emergency orders based upon an alleged pandemic of SARS-CoV-2/COVID-19.

23) In the Civil Defense Act Case, the Supreme Judicial Court confirmed that the General Court had delegated emergency powers to the Executive, which could be executed in the event of a civil defense emergency and that the Governor had properly exercised that power. The SJC in that case carried out its separate powers in adjudicating that result. The Plaintiff *does not* stipulate to the validity of the finding that such a civil defense emergency *ever* transpired.

24) None the less, the SJC in the Desrosiers case cited the South Bay case from the United States Supreme Court that an "unelected state judiciary, which lacks the background, competence and expertise to assess public health and is not accountable to the people…" cannot make health policy, which is within the realm of legislatures acting in accordance with the Executive.

25) In 2021, the courts generally have begun to reject elements of government overreach that reek of virus-theater with potential to create harm and to create secondary classes of citizenship based on government induced medical disability. In BST Holdings v. OSHA, 21-60845, before the Fifth Circuit Court of Appeals, on November 12, 2021, the Court enjoined an OSHA regulation mandating vaccines on private citizens, "the Mandate," noting, page 8, that "rather than a delicately handled scalpel, the Mandate is a one-size

fits-all sledgehammer that makes hardly any attempt to account for differences in workplaces (and workers) that have more than a little bearing on workers' varying degrees of susceptibility to the supposedly 'grave danger' the Mandate purports to address." Indeed, the Fifth Circuit challenged the entire premise that the country faces an extreme emergency from SARS-CoV-2/COVID-19.

26) This was equally the determination in the OSHA case at the US Supreme Court in which the Per Curiam opinion noted that "where the virus poses a special danger because of the particular features of an employee's job or workplace, targeted regulations are plainly permissible. We do not doubt…that OSHA could regulate risks associated with the Covid-19 virus…. It is telling that OSHA in its half century of existence, has never before adopted a broad public health regulation---addressing a threat that is untethered, in any causal sense, from the workplace. This 'lack of historical precedent,' coupled with the breadth of authority that the Secretary now claims, is a 'telling indication' that the mandate extends beyond the agency's legitimate reach…"

27) On November 22, 2021, in Robinson v. Missouri Department of Public Health, 20AC-CC0515, a Court equally demonstrated its frustration with SARS-CoV-2/COVID-19 mandates, placing these cases in context: "Missouri's local health authorities have grown accustomed to issuing edicts and coercing compliance…It is far past time for this unconstitutional conduct to stop…This case is about whether Missouri's Department of Health and Senior Services regulations can abolish representative government in the creation of public health laws…based on the unfettered opinion of an unelected official…This Court finds it cannot…"

28) This sense of what it means to legislate public health was aptly expressed in Logan Albright's recent book, Conform or be Cast Out (Winchester (UK, 2021) at p. 151, "the amount of lives we could save by taking swift and decisive action to ban cars, planes, pools, sports, pets, stairs, hamburgers, sex, beer, cigarettes, electricity, and pillows, is incalculable. The reason we don't ban those things comes from a recognition that life is inherently risky, and a life which minimized every conceivable danger would not be one worth living."

29) In the history of the Trial Court, the Trial Court has not issued standing orders as to general health policy such as the consumption of sugary drinks by litigants, nor has it ever barred smokers or the obese from the courts, nor has the Trial Court ever imposed a medical requirement for admission to the bar or for fitness to serve on a jury.

30) Entities charged with regulatory behavior which are not specifically charged with determining public health policy are acting outside of their superintendency power when the power to regulate veers from regulating within the sphere of delegated power to legislating public policy that strips the citizen of his or her rights.

31) The Defendant's actions in creating mask mandates and mandating remote hearings and barring the doors to the Court for two years grossly corrupted the very notion of a public court of justice, by creating a pre-condition of access to justice for the entire public of the Commonwealth, and limiting it to those who were willing to risk their health by compliance with the mask policy, and by locking out those who cannot.

32) The Defendant's actions in creating mask mandates and mandating remote hearings and barring the doors to the Court for two years grossly corrupted the very notion of the Court by transferring power from the people to access the building, to those who control the

Zoom system, who now control absolutely who may or may not have access to the court, and who can be shunted to a waiting room, and who can be mooted, or ignored or left to rot on hold for hours at end.

33) The Defendant's actions in creating mask mandates and mandating remote hearings and barring the doors to the Court for two years has fundamentally removed the entire public nature and Republican form of government by transforming an essentially and constitutionally public mingling place into the form of select faces on a Zoom screen, or voices on a telephone line, unseen and unheard by the public which has a right to observe.

34) The Defendant's actions in creating mask mandates and mandating remote hearings and barring the doors to the Court for two years has fundamentally prevented lawyers from being able to represent their clients within the legal system, eliminating the ability of lawyers to perform the usual and customary activities which transpire within the Court on a regular basis and which make the system work, not only in arguing motions and trying cases, but by removing the interchanges between counsel and clerks and others within the court system which constitutes and fosters collegiality of lawyers and those within the system, which fosters and smooths the processing of paperwork in a clerk's office particularly in emergency motions, and which includes marketing activity, use of a public law library, an opportunity to confidentially view files in the docket room, or to view opposing counsel try cases, or to watch how judges conduct trials, and the million other minor interactions that transpire unseen in court every day that makes justice work silently and efficiently, and cannot be occur on a Zoom screen or when a portion of the public is denied access over face masks.

35) The Trial Court clearly does not understand that lawyers cannot shake hands or confer in hallways on Zoom or generally get to know each other as citizens and colleagues and not mere adversaries.

36) Without a constitutional amendment, or any say of the General Court, the Defendant has fundamentally changed a Republican forum essential for justice from a place of democracy and liberty to one of sociologists Marc Auge's "non-places," an austere and liminal dystopian and non-democratic space that, while providing some type of result, has been utterly alienating in a sterile environment that is mostly noteworthy as a utilitarian and uninviting human wasteland.

37) Willfred McClay wrote of Winston Churchill's insistence on rebuilding the House of Parliament after it was bombed exactly as it was in World War II, with the argument that certain places become intertwined with their traditions and cannot be separated. "The space is ours to shape initially, but once we have filled and shaped it, it begins to take on a life of its own, as a place that molds us in turn. One tinkers with such places only at one's great peril, particularly when the shaping has been done by many hands over the many years. Not only does it rattle the bones of the dead, but it may undermine the prospects of those yet unborn…"

38) People cannot be removed from Courts. Period.

39) After two years of lock downs, the Defendant has clearly forgotten what a court is, how it operates, who uses it and, more importantly, who has the right to use it. The Defendant has exercised its superintendency power to corrupt and distort a branch of Republican government with its attendant result of "disabling" an entire community of those entitled to participate in public governmental process with no end in sight.

BACKGROUND OF THIS CASE

40) In early 2020, as history will record, the United States commenced a period of mass
hysteria in response to SARS-CoV-2/COVID-19, and began a series of ill-considered
lockdowns and mandates which have ultimately resulted in substantial deprivation of law,
deprivation of rights and damage to businesses, individuals and governmental process.

41)  By the summer of 2021, it was evident that SARS-CoV-2/COVID-19 had not reached
levels of prior and deadly pandemics and that mortality rates generally known not be the
threat that some believed it to be in 2020.

42) Notwithstanding evidence of exaggeration of risk, the Defendant entered in to a series of
extreme restrictions in the Court which restricted access to all rather than providing
reasonable accommodation to those who feared to come in to court. In other words, the
Court reacted negatively by exclusion of all, rather than positively by accommodating
those few who were afraid of public participation.

43) Plaintiff in this case first raised concerns about the constitutional and federal violations of
the Court's "reopening plan" in response to a request for public comments. Exhibit B
consists of Plaintiff's comments of August 14, 2020, raising all of the same points raised
in this Complaint, including the notion that "there will be lawyers, witnesses, jurors,
court officers, judges, reporters and other court personnel who need to walk around the
courts without face coverings…." Significant for this Complaint is the fact this letter was
met with indifference, and crickets, and a general sense of uncaring and concern for
community input and the rule of law.

44) The Standing Order in question, containing the mask mandate, was created a year later, and equally did not incorporate any provisions to address the Americans with Disabilities Act, or provide any exemptions in terms of public court access.

45) Prior to this date, the body of evidence was already present refuting the efficacy of face masks for preventing the spread of SARS-CoV-2/COVID-19. See, https://www.cato.org/working-paper/evidence-community-cloth-face-masking-limit-spread-sars-cov-2-critical-review# with its stated conclusion that, "The use of cloth facemasks in community settings has become an accepted public policy response to decrease disease transmission during the COVID-19 pandemic. Yet evidence of facemask efficacy is based primarily on observational studies that are subject to confounding and on mechanistic studies that rely on surrogate endpoints (such as droplet dispersion) as proxies for disease transmission. The available clinical evidence of facemask efficacy is of low quality and the best available clinical evidence has mostly failed to show efficacy, with fourteen of sixteen identified randomized controlled trials comparing face masks to no mask controls failing to find statistically significant benefit in the intent-to-treat populations." Though the review was dated November 2021, all or virtually all of the studies it reviews were published before the Defendant's discriminatory actions against the Plaintiff.

46) In the formulation of its mask policy, the Trial Court did not provide any countervailing evidence to the identified material, demonstrating that the policy was arbitrary, capricious and not based on any nexus between the mask policy and public health.

47) There was no reason to believe in July of 2021 that extreme government measures had any nexus with proper epidemiological containment of SARS-CoV-2/COVID-19,

48) Thus, as of July of 2021, the evidence at trial will show that no deadly epidemic based upon SARS-CoV-2/COVID-19 was posing a general health threat to the population or that any threat was extreme or of an emergency nature, or that governmental regulation or action was necessary to remediate an immediate and deadly health emergency or that any such emergency had a demonstrated nexus with face masks.

49) Prior to the implementation of the mask policy, the Commonwealth had enacted  its own order, https://www.mass.gov/info-details/covid-19-mask-requirements which states, "The following persons are exempt from the face coverings requirement:

- Children under 5 years old.
- Persons for whom a face mask or covering creates a health risk or is not safe because of any of the following conditions or circumstances:
    - the face mask or covering affects the person's ability to breathe safely;
    - the person has a mental health or other medical diagnosis that advises against wearing a face mask or covering;
    - the person has a disability that prevents them from wearing a face mask or covering; or
    - the person depends on supplemental oxygen to breathe.

50) In the formulation of its policy, the Trial Court failed to address the Commonwealth's recommendation of exclusion for medical exemption and failed to address any basis for exceeding the Commonwealth's recommendation of exclusion.

51) In the formulation of its policy, the Trial Court also exceeded its superintendency power, in taking a recommendation narrowly tailored to address concerns, valid or otherwise, of providing a "safe" environment and applying it, over broadly, to the public courts.

52) In November of 2021, the Plaintiff requested formal exemption under the Americans with Disabilities Act, as Plaintiff had been barred from public participation in court

proceedings in open court and noted a substantial inability to conduct court business "remotely."

53) On November 22, 2021, the Plaintiff received Exhibit C, denying exemption, and making the absurd suggestion that "Zoom" was a reasonable accommodation, when, as noted above, participation in court argument constitutes a small segment of court activities and functions of a trial lawyer. The other "accommodation" is that the Plaintiff would only voluntarily suffocate for part of the time in the court building.

54) The letter was also bizarre in its statement that there was a "threat to the health and safety of other court users and Trial Court employees…" an utterly unfounded and unsupportable proposition, considering that masks were a form of theater and not a form of effective epidemiology. Equally, the Court noted a "compelling interest in public health concerns during an active pandemic…" which did not exist and was not concern of the Court which had the option of allowing the fearful to appear remotely as their choice rather than penalizing those who were not.

55) On November 29, 2021, the Plaintiff filed his appeal, Exhibit D, a 5 page letter once again explaining the legal deficiency of Defendant's refusal to grant a medical exemption.

56) On December 6, 2021, the Plaintiff supplemented his appeal with Exhibit E, bringing to the Trial Court's attention case which had been generated since Exhibit D was created, which showed a growing pattern of denying authority to issue of SARS-CoV-2/COVID-19 mandates beyond the superintendency power of the issuing agency and demanding that the Trial Court abide by federal law and the United States Constitution.

57) On December 13, 2021 the Governor of the Commonwealth declined to implement a

18

statewide mask mandate, declining to declare to exercise "emergency" power under the Civil Defense Act which the Supreme Judicial Court has found had been delegated to the Governor by the General Court in the Civil Defense Act.

58) Following the Governor's determination not to issue an emergency order of statewide mask mandates, the General Court declined to exercise its legislative power to implement a statewide mask mandate. Indeed, rather than seeking the need to put on a mask as a compelling interest in public health, the Governor stated that "If people wish to add an extra layer of protection by wearing a mask in indoor settings, we would urge them to do so, especially when we have cases rising across the Commonwealth."

59) "Cases" are not synonymous with serious disease or death and the "cases rising" referenced by the Governor refer to an alleged variant akin to a bad cold or flu.

60) Thus, by December 13, 2021, both the General Court and the Executive had not seen fit to exercise their designated powers to implement health policy in the form of mask mandates.

61) The decision by the Executive and the General Court *not* to implement a mandate thus resulted in a curious and unexplained circumstance that the state courts became an archipelago of mask mandates surrounded by a sea of free movement. By way of example, the Middlesex County Superior Court in Woburn is abutted by Applebee's Restaurant and a Stop & Shop Supermarket. An individual is free to visit Applebee's without a mask in the presence of 230 people, and then to visit the supermarket with 400 others, but may not enter a public court building less than 100 yards away.

62) It is utterly unclear why the courts were deemed a particularly fearful vector of a killer virus and why it was more compelling that an individual be denied access to justice but

not a beer or a box of Fruit Loops.

63) By December 13, 2021, the Standing Order was utterly pointless and unsupportable as a matter of law, even it ever had a basis in law or fact.

64) On December 27, 2021 the Plaintiff received a denial of appeal from the Trial Court Exhibit F, a sparse and deficient 2 paragraph letter which simply reiterated the canard that Zoom and partial suffocation were a suitable accommodation.

65) Exhibit F fails to provide a statement that responds to the contention that the Defendant had not been delegated superintendency power to issue mask mandates by identifying the source of the grant of authority, which is the first element of the dispute.

66) Exhibit F fails to provide a statement identifying a compelling public need for the mask mandate.

67) Exhibit F fails to provide a statement that demonstrates that a face mask is anything other than virus theater.

68) Exhibit F fails to provide any proof of that masks have any effective benefit in preventing the spread of disease.

69) Exhibit F fails to provide any proof that masks do, in fact, provide a benefit to court visitors.

70) Exhibit F fails to provide a statement that there is a nexus between an identified compelling government interest within its power to cure.

71) Exhibit F fails to provide a statement explaining why medical exemption is not being granted, and why the Trial Court is exempt from the provisions of the ADA.

72) Of equal import, Exhibit F fails to demonstrate a correlation between the issues raised in the Plaintiff's ADA claim and an explanation of Trial Court policy.

73) Finally, Exhibit F fails to explain how a trial lawyer is supposed to engage in the usual and customary practice of trial law by Zoom, when physical participation in process is a requirement of competent and zealous advocacy, and reflects a general lack of understanding what a lawyer actually does inside a court, and fails to explain why a lawyer can be dictated to by the Court statewide as to how to serve his client's interest, when, in fact, the client has the power to decide what is reasonable, not the Court.

74) The Trial Court by its "offer" created the absurd situation in which an attorney would be required to discuss his or her personal medical situation with a potential client as part of establishing an attorney/client relationship in which court participation is the service being sold; it is not clear where the power is derived for the Trial Court to make such a demand, or why it would be reasonable to follow such a practice.

75) On January 17, 2022, Plaintiff sent a final letter to the court, Exhibit G, raising the concern that the Trial Court was not engaging in proper response to a demand under ADA and that the Trial Court, ironically, had failed to respond appropriately to the demand under the ADA.

76) Exhibit H constitutes a series of further emails completing the communication by the Plaintiff in which Plaintiff seeks conformity of the Trial Court's response to its obligations under the ADA, including pointing out as of February 8, 2022 that the Courts remain one of the last few places to mandate mask, and that continuing adherence to masks policies is now simply irrational.

77) The recent case of Rivera v. Altranais Home Care LLC 19 cv 30139, in the US District Court for the District of Massachusetts, with a thoughtful decision by Magistrate Judge Robertson dated January 18, 2022, affirms that the obligation of the interactive process is

alive and well in ADA doctrine, and the question of whether the process was followed is one of fact for the finder of fact.

78) The Plaintiff's process with Trial Court was not interactive, but demonstrates an arrogant refusal to participate in a formal dialog with the Plaintiff; considering the Trial Court's clear understanding of the law; to this day, the Trial Court's commitment to its mask policy, and the original reason for it, remain cryptic. The factual question remains viable as to why the Trial Court continues to refuses to answer reasonable questions that would lead to reasonable dialog.

## ADDITIONAL FACTUAL BACKGROUND AS CONTEXT

79) On October 21, 2021, United States Supreme Court Associate Justice Gorsuch, in his dissent from the <u>Does v. Mill</u> decision  (21A90), affirmed the position that the issue is not whether an emergency justifying powers ever existed, but whether the emergency continues to exist at the time extraordinary, temporary measures are adopted, stating "I accept what we said 11 months ago remains true today---that stemming the spread of Covid qualifies as a compelling interest…At the same time, I would acknowledge that this interest cannot qualify forever…"

80) Likewise, the Defendant in this case must prove and demonstrate that the compelling state interest existed on the day the challenged policy was enacted, and that the Defendant had not merely relied on prior concerns. In July of 2021, the Defendant had no reasonable belief that its actions were necessary, proper or useful, or otherwise met the "purposes" of the Standing Order

81) In the face of the reality of the circumstances, the Defendant imposed a Standing Order which had the affirmative effect of creating a de facto disability on the Plaintiff, barring the Plaintiff from participating in social activity and regular life activity, on the basis of disability caused by the Policy.

82) The Defendant lacked a compelling public interest by creating the Standing Order.

83) The Standing Order that was implemented cannot withstand strict scrutiny because it was overly broad and under inclusive, and failed to demonstrate a nexus between purpose and Policy, and which caused harm to the Plaintiff without cause and which rendered him disabled as a matter of fact and law.

84) The Fifth Circuit also noted that the Mandate from OSHA was "staggeringly overbroad" and "under inclusive," meaning that the Mandate lacked targeted focus.

85) In the case at bar, the Standing Order is equally "staggeringly overbroad" and "under inclusive," and lacking in compelling governmental purpose and nexus which would withstand strict scrutiny and equally the effect of abuse of power and usurpation of legislative power.

86) In the interest of using a meat cleaver on a grape, the Defendant has engaged in willful discrimination against the Plaintiff and has caused him and others collateral harm which warrants injunctive relief for the harm caused.

COUNT I
(VIOLATION OF THE AMERICANS WITH DISABILITIES ACT)
(DEJURE DISABILITY)

87) The Plaintiff restates paragraphs 1-86 and specifically incorporates them herein.

88) The Plaintiff has a de jure disability as defined under the Americans with Disabilities Act, in that his physician has specifically advised against the wearing of face masks in consultation with, and in review of, the Plaintiff's medical status.

89) Under the Americans with Disabilities Act, the Trial Court was required to provide a reasonable accommodation to the Plaintiff.

90) The Trial Court offered no reasonable accommodation which reflected a means of conducting daily activity in the usual and customary manner as required by the ADA.

91) At no time did any individual with any competence or understanding of the medical issues make any effort to understand the medical issue or to make an offer of reasonable accommodation in concert with participation by the Plaintiff.

92) The reasonable accommodation in this case was not to bar the Plaintiff from the life activity, but to exempt the Plaintiff from compliance with the regulation, which, in any event, had no nexus to any viable public health objective.

93) As a result of this failure by the Trial Court, the Plaintiff was denied his right of access required by the Americans with Disabilities Act and the ability to engage in his usual employment, and was otherwise harmed.

COUNT II
(VIOLATION OF THE AMERICANS WITH DISABILITIES ACT)
(DEFACTO DISABILITY)
(DECLARATORY JUDGMENT OF UNENFORCEABILITY)

94) The Plaintiff restates paragraphs 1-93 and specifically incorporates them herein.

95) The Plaintiff had been fully able to participate in all usual and customary court activities within the requirements of his profession as any preexisting medical concerns were not an impediment to participation.

96) The Trial Court's Standing Order therefore *created* the condition leading to the bar to access.

97) At no time during the alleged pandemic has the Plaintiff ever worn a face mask, and the Plaintiff has been routinely granted exemption to enter public and private spaces within the Commonwealth without comment or has been given accommodation which has been seamless and invisible and was made without question as is required by the Americans with Disabilities Act.

98) Any disability created under the Americans with Disabilities Act was therefore a result of government action, not a preexisting dejure disability; by definition, it is the masking policy itself which leads to disability, and which would evaporate with the termination of the policy or exemption to it.

99) This de facto disability, in which the government first acts, then discriminates, is viewed under a higher standard of review, as opposed to "reasonable accommodation."

100)      The Trial Court cannot show that that it is within its superintendency power to declare health policy that leads to exclusion from public participation in government, and which not only penalizes the Plaintiff but also those of the Court community who rely on Plaintiff's access to Court, including the Court itself, clients, opposing counsel and the like.

101)      The Trial Court cannot show that its policy represented any kind of compelling governmental need, as the so-called pandemic was no longer an "emergency" as of July 2021, and there was no compelling public health need to issue the Standing Order as it applied to the Plaintiff.

102)  Even if a compelling public health emergency existed, and even if the Trial Court had superintendency power to create health policy, both of which the Plaintiff denies, and which it is the Trial Court's obligation to prove at trial, there was no nexus between the public need and the Standing Order as crafted and no such policy had been historically enacted.

103)  Even if a compelling public health emergency existed, and even if the Trial Court had superintendency power to act, and even if there was a nexus between the public need and the Standing Order as crafted, all of which the Plaintiff denies, and it is the Trial Court's obligation to prove at trial, the Standing Order was not narrowly tailored to meet the nexus, as the policy was overly broad in the equivalent of using a meat cleaver to split a grape.

104)  The Trial Court's Standing Order is illegal, unconscionable and unsupportable.

105)  If the Court does find the Standing Order is enforceable, the remedy is exemption.

106)  If the Court does not find that the Standing Order is enforceable, the remedy is to strike the policy in its entirety.

107)   In either circumstance, the Plaintiff has been harmed by denial of access under the Americans with Disabilities Act based upon government action creating de facto disability, and thereby denying him his access rights protected by law and has otherwise been harmed.

WHEREFORE, the Plaintiff does pray and request as follows:

1)  That the Court, after trial, determine that the Defendant violated the Plaintiff's rights under the Americans with Disabilities Act and the Guaranty Clause.

2)   The Court determine that the Defendant refused to provide reasonable accommodation under the Americans with Disabilities Act.

3)   The Court determine that the Defendant to respond to the Plaintiff's ADA demand with an interactive and meaningful process as required by federal law.

4)   That the Court declare the Standing Order unlawful as being created outside the Trial Court's lawful power, that the Standing Order had no compelling public purpose, that there was no nexus between the Standing Order and the public purpose and that the Standing Order was both overly broad and under inclusive, and that the policy should be deemed without force and effect.

5)   That even if the Court were to find the Standing Or to be lawful, that the Defendant failed to exempt the Plaintiff, who was rendered de facto disabled by the Act;

6)   That this Court award the Plaintiff his damages, costs and attorney's fees in an amount to be determined; and

7)   Any other relief deemed appropriate by this Court.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE

Respectfully Submitted,
**The Plaintiff**
Pro se,


/s/Robert N. Meltzer_____
Robert N. Meltzer, BBO #564745
The Mountain States Law Group
Wheelhouse at the Bradford Mill
33 Bradford Street
Concord, MA 01742
Phone: (978) 254 6289
inbox@mountainstateslawgroup.com


Dated: February 10, 2022